UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| LISA DIANE PEELER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:20 CV 241 DDN |
| ) | |
| KILOLO KIJAKAZI,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Lisa Diane Peeler for disability insurance benefits under Title II of the Social Security Act and supplemental security income under Title XVI of the Social Security Act. The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

For the reasons set forth below, the decision of the Commissioner is affirmed.

## I.  BACKGROUND

Plaintiff Lisa Peeler, who was born on March 5, 1957, protectively filed her application for Title II and Title XVI benefits on June 12, 2018, with an alleged onset date of February 15, 2015. (Tr. 172.) She alleged disability due to fibromyalgia, fibromyalgia fog, fatigue, restless leg syndrome, painful bladder syndrome, arthritis, lower back pain, bipolar disorder, "constant pain everywhere," obesity, and hypertension. (Tr. 226.) Her

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Kilolo Kijakazi is substituted for Andrew Saul as defendant in this action. No further action is needed for this action to continue. See 42 U.S.C. § 405(g) (last sentence).

claim was denied, and she requested a hearing before an administrative law judge (ALJ). (Tr. 99, 169.)

On November 19, 2019, plaintiff testified before an ALJ. (Tr. 34-68.) On January 6, 2020, the ALJ issued a partially favorable decision, concluding that plaintiff became disabled on April 1, 2018, but was not disabled before that date. (Tr. 12-13.) The Appeals Council denied plaintiff's request for review on September 14, 2020. (Tr. 1-3.) The decision of the ALJ therefore stands as the final decision of the Commissioner subject to judicial review by this Court under 42 U.S.C. § 405(g).

## II.  MEDICAL AND OTHER HISTORY

The following is a summary of plaintiff's medical and other history relevant to this appeal.

On January 23, 2015, plaintiff saw Danielle Jansen, F.N.P., with the complaint that her medication for bipolar disorder was ineffective. (Tr. 690.) She was tearful and described having ups and downs, as well as suicidal thoughts but no suicidal plans. (*Id*.) She refused to admit herself in an inpatient program or discuss the issues with a counselor at that time. (*Id*.)

On February 3, 2015, plaintiff again saw Ms. Jansen to discuss her mental health. (Tr. 688.) Plaintiff was tearful during the appointment and stated that she had hit a low point and needed medication, as her current medication was not providing relief. (*Id*.) She stated that she was not suicidal but did not want to live. (*Id*.) She expressed an interest in voluntary admission to an inpatient unit for psychiatric evaluation. (*Id*.)

On March 11, 2015, plaintiff saw Ms. Jansen for a check-up and medication refills. (Tr. 685.) She stated that she was doing much better after her admission at Southeast Psychiatric Unit and that her medications were working well. (*Id*.)

On April 23, 2015, plaintiff saw Linda Hammonds, psychiatric mental health nurse practitioner at Kneibert Clinic, for a psychiatric evaluation. (Tr. 363.) Plaintiff said that she quit her job due to depression and anxiety. (*Id*.) She reported feelings of worthlessness, low energy, and excessive sleep. (*Id*.) Ms. Hammonds diagnosed plaintiff with bipolar

disorder and anxiety. (Tr. 367.) Ms. Hammonds prescribed Trileptal and continued Risperdal, both for plaintiff's mood. (Tr. 368.)

On May 5 and May 20, 2015, plaintiff saw Naveed Mirza, MD, psychiatrist, for medication management and reported struggles with her medication. (Tr. 355, 359.) She reported highs when she was not able to sleep, as well as irritability and suicidal thoughts. (Tr. 359.) She also stated that she did not want to be in public and wanted to stay in her room most of the time. (Tr. 355.) A review of systems indicated mild depressed mood and decreased energy. (Tr. 355, 360.)

On June 2, 2015, plaintiff saw Laura Hammonds, psychiatric mental health nurse practitioner, for medication management. (Tr. 347.) Plaintiff reported that she was not feeling better and had stopped taking Zoloft, as she believed it made her more depressed. (*Id*.) She stated that she was sleeping too much, staying in her room, and not engaging in her usual activities. (*Id*.) Ms. Hammonds increased Lamictal for mood stabilization and prescribed Wellbutrin for anxiety and depression. (*Id*.) On July 1, 2015, plaintiff reported that her medications were working and her overall mood had improved. (Tr. 343.)

On July 30, 2015, plaintiff presented to the emergency department ("ED") at Saint Francis Medical Center ("SFMC") with complaints of low back pain and nausea. (Tr. 506.) Plaintiff paced the room and appeared to be in mild pain distress due to low back pain. (Tr. 508.) SFMC staff diagnosed her with a small hiatal hernia, shingles, and nonspecific bowel pattern which may have been related to gastroenteritis. (Tr. 511.)

On August 5, 2015, plaintiff saw Dr. Mirza for medication management. (Tr. 339.) She stated that she had been feeling more depressed, lacked motivation or drive, and had feelings of hopelessness. (*Id*.) She said that she felt she was "losing it real bad" and was stuck in her room. (*Id*.) Dr. Mirza noted a severe depressed mood and moderate decreased energy. (*Id*.)

On September 25, 2015, plaintiff again saw Dr. Mirza for medication management. (Tr. 335.) Plaintiff told Dr. Mirza that she was doing better with motivation and was fair on her medications, but some feelings of exhaustion and lack of energy bothered her. (*Id*.)

On October 21, 2015, plaintiff saw Ms. Jansen for medication management. (Tr. 669.) Plaintiff stated that she was experiencing chronic back pain, especially after exertion such as work and chores. (*Id*.) She exhibited tenderness on palpation of her back. (Tr. 670.)

On January 6, 2016, plaintiff saw Ms. Hammonds for medication management. (Tr. 323.) Plaintiff said that she noticed herself cycling in and out of depression, so Ms. Hammonds prescribed Risperdal to help stabilize plaintiff's mood. (*Id*.) Ms. Hammonds noted plaintiff's moderate depressed mood and mildly decreased energy at the visit. (*Id*.)

On March 15, 2016, plaintiff went to the ED at SFMC after she slipped in her kitchen and landed on her left shoulder. (Tr. 516.) After finding no swelling and normal skin color and temperature, SFMC staff discharged plaintiff with a sling for her arm. (Tr. 518.)

On April 1, 2016, plaintiff saw Ms. Hammonds for medication management. (Tr. 316.) Plaintiff stated that she stopped taking her mood stabilizer because she believed it was keeping her awake, and Ms. Hammonds prescribed Trileptal for mood stabilization. (*Id*.) Plaintiff's mental status exam showed rapid speech, hyperactivity, elevated and depressed mood, and racing thoughts. (Tr. 317.)

On May 19 and May 26, 2016, plaintiff saw Ms. Jansen with complaints of back pain. (Tr. 657, 660.) Ms. Jansen noted plaintiff's history of intermittent back pain. (Tr. 660.) Plaintiff's lower back exhibited bilateral tenderness on palpation. (Tr. 658, 662.) Ms. Jansen ordered an x-ray and performed a steroid injection for acute back pain relief. (Tr. 659, 663.)

On May 20, 2016, an x-ray of plaintiff's lumbosacral spine showed degenerative change of the spine, worse at L4-5 and L5-S1. (Tr. 724.) It was noted in plaintiff's history that she had been experiencing low back pain for one year with no injury. (*Id*.) On June 6, 2016, an x-ray of plaintiff's right knee showed arthropathy that was essentially unchanged since plaintiff's last knee x-ray from July 2012. (Tr. 725.)

On June 9, 2016, plaintiff saw Ms. Hammonds for medication management. (Tr. 312.) She reported problems with knee pain and said that she was "falling apart." (*Id*.)

Her review of systems reflected moderate somatic complaints but was otherwise normal; similarly, her mental status exam reflected fair insight and judgment but was otherwise normal. (*Id.*)

On October 19, 2016, plaintiff presented to the ED at SFMC with complaints of chest pain, shortness of breath, and nausea. (Tr. 535.) SFMC staff diagnosed her with chest wall pain and discharged her in stable condition the same day. (Tr. 539.)

On December 6, 2016, plaintiff saw Ms. Jansen with complaints of right knee pain and swelling following a fall the previous month. (Tr. 863.) Plaintiff was tearful and stated that her severe fibromyalgia pain, originating in her right shoulder and radiating to her fingers, was disrupting her sleep and causing her depression to worsen. (*Id.*) Upon examination, her lumbosacral spine and shoulders exhibited tenderness upon palpation; Ms. Jansen also noted pitting edema at both ankles. (Tr. 864.) Ms. Jansen advised rest, application of ice, compression with a bandage, and elevation of the affected area, as well as a non-steroidal anti-inflammatory (NSAID) for pain. (Tr. 865.)

On January 20, 2017, plaintiff saw Nathan Sprengel, D.O., family medicine physician, for back pain and fibromyalgia. (Tr. 636.) Plaintiff stated that she could not stand to wash dishes without needing to take a break and that she could not exercise due to pain. (*Id.*) Dr. Sprengel prescribed prednisone and muscle relaxers, and he recommended applying heat, stretching, and considering physical therapy if symptoms continued. (Tr. 639.)

On January 26, 2017, plaintiff saw Ms. Hammonds for medication management. (Tr. 375.) Plaintiff stated that she was cycling between hypomania and depression. (*Id.*) Ms. Hammonds adjusted plaintiff's medications, starting Seroquel and discontinuing Prozac. (*Id.*)

On February 6, 2017, plaintiff returned to Dr. Sprengel with a complaint of back pain. (Tr. 632.) She stated that prescription medications, including steroids and muscle relaxers, were not relieving her pain. (*Id.*) She said that sitting was painful, and she was unable to perform most of her daily functions due to pain. (*Id.*) Due to a recent insurance change, she was unable to fill her prescription for Lyrica, her fibromyalgia medication.

(*Id.*)  Because plaintiff's pain was out of control, Dr. Sprengel prescribed hydrocodone as a short-term solution. (Tr. 634.)  Dr. Sprengel opined that the major problem with her back was due to her weight, lack of core muscle support, and poor muscle tone in her torso. (*Id.*) He emphasized the importance of physical therapy to help with plaintiff's deficits in muscle tone. (*Id.*)

On February 23, 2017, plaintiff again saw Dr. Sprengel for back pain. (Tr. 629.) Her previous diagnoses were fibromyalgia and sciatica. (*Id.*)  She stated that she continued to have significant pain in her back and lower extremities, as well as throughout her body, and that she felt as if her pain had taken over her life. (*Id.*)

On March 23, 2017, plaintiff saw Ms. Hammonds for medication management. (Tr. 541.)  Plaintiff stated that she was very depressed, was sleeping a lot, and had low energy. (*Id.*)  Ms. Hammonds noted that plaintiff was alert and oriented but was tearful during the appointment. (*Id.*)

Also on March 23, 2017, plaintiff underwent an x-ray of her lumbar spine. (Tr. 437.)  The x-ray showed mild narrowing of the disc space at L5-S1, as well as degenerative change of the facet joint at L4-5 and L5-S1. (*Id.*)  The findings were multilevel degenerative disease of the lumbar spine, with mild disc bulging at L2-5 and moderate to severe bilateral facet arthropathy at L5-S1.[2] (*Id.*)  An MRI conducted on April 14, 2017, showed the same conditions. (Tr. 773.)

On April 19, 2017, plaintiff presented to the ED at SFMC with complaints of chest pain. (Tr. 543.)  Her associated symptoms included headache and shortness of breath. (*Id.*) She reported that she did not have back pain. (*Id.*)  Upon feeling improvement of her symptoms, she declined further studies and left the ED. (Tr. 544.)

On June 15, 2017, plaintiff saw Ms. Hammonds for medication management. (Tr. 542.)  Plaintiff reported feeling physically ill, having low energy, not enjoying her activities, and sleeping "o.k." (*Id.*)

---

[2] Bilateral facet arthropathy is a degenerative condition of the facet joint, causing pain. https://www.ncbi.nlm.nih.gov/books/NBK538228/.

On August 9, 2017, plaintiff visited Nivedita Nagam, M.D., with complaints of chronic pain. (Tr. 447.) Plaintiff indicated that her symptoms included decreased mobility, joint tenderness, nocturnal awakening, and nocturnal pain, and they were aggravated by activity and weather. (*Id*.) She stated that her pain was relieved by pain medication and rest. (*Id*.) Plaintiff's physical exam showed diffuse musculoskeletal pain, but Dr. Nagam noted otherwise normal findings, including good range of motion and no edema. (Tr. 449.) Her review of systems was positive for back pain, decreased mobility, joint pain and tenderness, and neck pain, but it was negative for anxiety and depression. (*Id*.) Dr. Nagam prescribed meloxicam, an NSAID, for plaintiff's pain and advised plaintiff to keep active with regular stretching and to start an exercise regime. (Tr. 450.)

On August 29, 2017, plaintiff saw Tyler Ptacek, M.D., for a pain management evaluation. (Tr. 775.) She reported lower back pain, cervical back pain, bilateral leg pain, and bilateral arm pain that began four years prior. (*Id*.) She described her pain as stabbing in nature and as a 10/10 both with and without medication. (*Id*.) Dr. Ptacek's physical examination of plaintiff indicated that bending at the waist did not reproduce pain, but extension and lateral bending of the lumbar spine resulted in pain. (Tr. 778.) She exhibited tenderness upon palpation at 11 out of 18 tender points. (*Id*.) The straight leg raise test was negative bilaterally. (*Id*.) Dr. Ptacek discussed medication options and referred plaintiff to warm water aerobics, which he noted has the best evidence for treating fibromyalgia. (Tr. 779.)

On September 7, 2017, plaintiff saw Ms. Hammonds for medication management. (Tr. 548.) Plaintiff stated that she was not feeling depressed and was enjoying her activities, but she was not sleeping well due to pain. (*Id*.) She reported that she stopped taking some of her psychoactive medications on her own. (*Id*.)

On September 22, 2017, plaintiff followed up with Dr. Ptacek. (Tr. 781.) She again reported pain scores of 10/10 both with and without medication, but Dr. Ptacek noted that plaintiff was not writhing in pain and did not change positions during the course of the visit. (*Id*.) She was able to sit comfortably in a chair, participate in conversation, and walk without assistance. (*Id*.) She was participating in aquatic therapy at the YMCA. (*Id*.) Dr.

Ptacek's physical examination of plaintiff indicated that bending at the waist did not reproduce pain, but extension and lateral bending of the lumbar spine resulted in pain. (Tr. 784.)

On February 5, 2018, plaintiff presented to the ED at SFMC with reports of chest pain and shortness of breath. (Tr. 547.) She mentioned that she had been out of her antihypertensive medication. (Tr. 552.) She was discharged the same day but returned to the ED on February 9, 2018, with chest pain. (Tr. 557.) She stated that she had been in constant pain all week. (Tr. 559.)

### ALJ Hearing

On November 19, 2019, plaintiff appeared before an ALJ and testified to the following. She only drives once a month, due to knee pain. (Tr. 38.) Otherwise, her husband drives her. (*Id*.) She has not worked since February 15, 2015, when she left her job as a waitress. (Tr. 39.) She had to take off work frequently for illness, and her absences were accommodated by her employer. (Tr. 41.) The combination of her physical impairments, including pain in her lower back, both knees, and left ankle, and her mental impairments, including bipolar disorder, caused her to quit her job. (Tr. 42-43.) She did not often make it to work six days out of the week. (Tr. 45.) If she had to work eleven hours instead of her usual eight hour shift, she would then miss several days of work. (Tr. 46.) She sometimes had to leave work in the middle of an eight hour shift due to pain. (*Id*.)

Plaintiff cannot sit down with her knees bent. (Tr. 45.) She has pain in both knees, but her right knee is worse; she has received injections in her knee. (Tr. 50.) She has also received epidural injections in her back. (Tr. 51.) She fractured her ankle and tore her Achilles tendon in July 2018, which continues to cause swelling and for which she uses a walker. (Tr. 48.) She previously fractured both ankles in 2014 while at work. (Tr. 49.) She has received injections in her right shoulder to treat arthritis. (Tr. 53.)

While her medications are working at the time of the hearing, they have to be adjusted once her body is acclimated to them. (*Id*.) Her medications for fibromyalgia and

bipolar disorder cause weakness, fatigue, and dizziness. (Tr. 54.)  Between February 2015 and the time of the hearing, there has not been a time when she could work for a month or more because she cannot sit down or stand up. (Tr. 54-55.)

Plaintiff received a spinal cord stimulator on a trial basis to alleviate the pain in her lower back. (Tr. 55.)  While she experienced 80 percent pain relief for the first three days, her pain worsened during the last four days of the trial, so she declined a permanent spinal cord stimulator. (Tr. 55-56.)

She uses her walker in the house due to the pain in her knees and lower back. (Tr. 57.)  She has tried to start walking as part of an exercise regime, but she can only make it three minutes before needing to sit on her walker. (Tr. 58.)  Swimming helps, and she can do all kinds of exercises in the swimming pool. (*Id.*)  Getting up frequently throughout the day does not help her pain, but exercising in her chair does. (Tr. 58-59.)  She does not take any pain medication, other than Advil, because opiates are not prescribed for fibromyalgia. (Tr. 59.)

A vocational expert testified to the following.  Plaintiff's past work as a waitress is categorized as light, and there are no transferable skills from plaintiff's past work to work at the sedentary exertional level. (Tr. 61.)  Plaintiff's past work would be available to a hypothetical individual with the same age, work history, and education that could perform work at the light exertional level. (*Id.*)  The job would not be available to a hypothetical individual that could stand and walk for only four hours out of an eight hour shift. (Tr. 62.)  It would be possible for a hypothetical individual to sit for a few minutes during a thirty to sixty minute period, as long as there is no loss in production. (*Id.*)  No more than one absence per month would be tolerated by an employer. (*Id.*)  A person with a walker would not be able to work as a waitress. (Tr. 65.)

### III.  DECISION OF THE ALJ

On January 6, 2020, the ALJ issued a decision that plaintiff was not disabled prior to April 1, 2018, but became disabled on that date and has continued to be disabled through the date of decision. (Tr. 12-13.)  At Step One, the ALJ determined that plaintiff was

insured through December 31, 2018, and had not engaged in substantial gainful activity since February 15, 2015. (Tr. 13.)

At Step Two, the ALJ found that plaintiff suffers from the following severe impairments: multilevel degenerative disc disease of the lumbar spine, chronic pain syndrome/fibromyalgia, right knee osteoarthritis, right shoulder osteoarthritis, history of congestive heart failure, and morbid obesity. (Tr. 14.) The ALJ found that plaintiff's other impairments, including bipolar disorder and anxiety, were non-severe. (Tr. 14-15.) The ALJ noted that the medical evidence regarding plaintiff's reported mental impairments does not support a finding of severity, as a majority of psychological examinations have yielded normal findings. (Tr. 16.) The ALJ found that plaintiff generally presented with no more significant abnormalities than a depressed and/or anxious mood with low self-esteem and impaired insight into her conditions; greater abnormalities were isolated and only present at times of medication noncompliance. (*Id*.)

At Step Three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment on the Commissioner's list of presumptively disabling impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17.)

At Step Four, the ALJ found that prior to April 1, 2018, plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). (Tr. 18.) The ALJ noted that plaintiff's only persistent abnormality was morbid obesity; when she presented with other abnormalities, such as baseline pain behavior, tenderness, or pain with range of motion, she did not exhibit an intensity or persistence as would reasonably support her allegations. (Tr. 20.) The ALJ found that the record does not document exacerbations of plaintiff's condition such that plaintiff would have been absent from work regularly. (*Id*.) The ALJ also noted that plaintiff reportedly stopped working due to her mental impairments, which the ALJ found non-severe, rather than her physical impairments. (Tr. 21.)

At Step Five, the ALJ found that prior to April 1, 2018, plaintiff was capable of performing her past relevant work as a waitress. (Tr. 23.) Beginning on April 1, 2018, the

ALJ concluded that plaintiff was an individual of advanced age. (Tr. 24.) After April 1, 2018, considering plaintiff's age, education, work experience, and RFC, there are no jobs that exist in significant numbers in the national economy that plaintiff can perform. (*Id*.) The ALJ therefore concluded that plaintiff was disabled as of April 1, 2018. (Tr. 25.)

## IV.  GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id*. In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. *Id*. As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or could be expected to last for at least 12 continuous months. 42 U.S.C. § 1382c(a)(3)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Pate-Fires*, 564 F.3d at 942 (describing the five-step process).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii), 416.920 (a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four

requires the Commissioner to consider whether the claimant has the RFC to perform her past relevant work (PRW). 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id*.; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues on appeal that the ALJ's determination that plaintiff was not disabled between February 1, 2015, and April 1, 2018, is not supported by substantial evidence. Specifically, plaintiff argues that the ALJ incorrectly determined that plaintiff was able to return to her prior job. She asserts that, due to the combination of her mental and physical impairments, she was unable to work full shifts after February 1, 2015, and she was missing a significant number of her shifts. (Doc. 23 at 8-9.) She also argues that the ALJ's conclusion that her mental impairments were non-severe is contradicted by plaintiff's medical provider and is not supported by substantial evidence. (*Id*. at 10.)

Many of plaintiff's psychological examinations between February 2015 and April 2018 show normal findings, including orientation to place and time and normal mood, affect, behavior, judgment, and thought content. (Tr. 343, 449, 517, 537, 542, 546, 548, 558, 575, 594, 599, 604, 608, 613, 618, 627, 648, 651, 654, 656, 658, 661, 667, 670, 673, 676, 679, 682, 686.) Between February 2015 and April 2018, plaintiff reported periods of stable moods and enjoyment of her activities. (Tr. 384, 548.) The ALJ is not required to defer or give any specific evidentiary weight to any medical opinions, including those of plaintiff's providers. 20 C.F.R. § 404.1520c(a); 20 C.F.R. § 416.920c(a). Rather, the ALJ considers the supportability and consistency of the medical opinions. *Id*. Here, the ALJ found that plaintiff's psychological examinations have yielded largely normal findings, and she has not presented with greater or more persistent abnormalities that would support a

finding of severity. (Tr. 16.) The ALJ's conclusion regarding the severity of plaintiff's mental impairments is supported by substantial evidence.

Plaintiff further argues that the ALJ's conclusions regarding her physical impairments were not supported by substantial evidence. (Doc. 23 at 13.) She contends that she could not stand for long periods of time and could not finish many of her shifts, so the ALJ's conclusion regarding her RFC was not adequately supported. (*Id.*)

Residual functional capacity is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). The claimant has the burden to establish her RFC. *Mabry v. Colvin,* 815 F.3d 386, 390 (8th Cir. 2016). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Ultimately, RFC is a medical question, which must be supported by medical evidence contained in the record. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). The RFC need only include the limitations supported by the record. *Tindell v. Barnhart*, 444 F.3d 1002, 1007 (8th Cir. 2006). There is no requirement that an RFC finding be supported by a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).

Part of the RFC determination includes an assessment of the claimant's credibility regarding subjective complaints. Using the *Polaski* factors, "[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (noting *Polaski* factors must be considered before discounting subjective complaints). The *Polaski* factors include (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Polaski*, 739 F.2d at 1322; see also 20 C.F.R. §§ 404.1529, 416.929.

The ALJ concluded that prior to April 1, 2018, plaintiff had the RFC to perform light work, including occasionally climbing on ropes, ladders, scaffolds, ramps, and stairs and occasionally stooping, kneeling, crouching, or crawling; however, she should avoid concentrated exposure to temperature extremes, vibrations, and work hazards.  (Tr. 18.)  The ALJ also concluded that plaintiff was capable of performing her PRW as a waitress.  (Tr. 23.)

Here, the ALJ considered the *Polaski* factors.  The ALJ is "not required to discuss each *Polaski* factor as long as '[she] acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).  Regarding plaintiff's daily activities, the ALJ concluded that, if plaintiff's activities were limited, the limitations were primarily due to lifestyle choice rather than to plaintiff's impairments.  (Tr. 21.)  The ALJ noted that plaintiff reported that she stopped working due to her mental impairments, which the ALJ concluded were non-severe, rather than due to her severe physical impairments.  (Tr. 21, 363.)

The ALJ also found that plaintiff did not present to her examiners with regular exacerbations of her impairments or fatigue and that her complaints of pain were inconsistent with her pain behavior.  (Tr. 21.)  Many physical examinations yielded normal musculoskeletal findings, including no back pain, joint pain, or edema.  (Tr. 536-37, 543-44, 551, 558, 627, 630, 678, 682, 1036.)  The ALJ observed that an x-ray of plaintiff's right knee performed in June 2016 showed arthropathy that was essentially unchanged since plaintiff's last x-ray from July 2012. (Tr. 725.)  The ALJ also noted that plaintiff presented only once with pain behavior in connection with acute low back pain.  (Tr. 20, 508.)  The record notes that plaintiff was in mild distress and was pacing the room.  (Tr. 508.)  During her September 22, 2017, visit with Dr. Ptacek, plaintiff reported pain scores of 10/10 both with and without medication.  (Tr. 781.)  However, her ability to sit comfortably in a chair, participate in conversation, and walk without assistance during the visit undercut her subjective report of pain.  (*Id*.)  *See Baker v. Apfel*, 159 F.3d 1140, 1145 (8th Cir. 1998)

("Based on all the medical evidence, there is no doubt that the claimant experiences pain; the question is whether the pain, in and of itself, is so severe as to be disabling.").

The regulations for pain evaluation stress that the ALJ should consider the type of treatment that the claimant receives when evaluating pain. *See* 20 C.F.R. §§ 404.1529, 416.929. The ALJ observed that plaintiff's prescribed treatment was routine and conservative, with no documentation of limiting side effects. (Tr. 20.) Plaintiff's physicians often prescribed medication and physical activity, including physical therapy, stretching, and water aerobics, to alleviate her symptoms. (Tr. 450, 634, 639, 779, 865.) The record reflects one steroid injection on June 9, 2016, to treat plaintiff's low back pain. (Tr. 659.) Plaintiff herself stated on August 9, 2017, that her pain was relieved by pain medication and rest. (Tr. 447.)

In determining plaintiff's RFC, the ALJ concluded that plaintiff's subjective reports of pain were not fully consistent with or supported by the objective medical evidence. (Tr. 20.) Substantial evidence exists in the record to support the ALJ's determination that plaintiff was not disabled prior to April 1, 2018.

## CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

                                                /s/   David D. Noce  
                                      **UNITED STATES MAGISTRATE JUDGE**

Signed on March 4, 2022.